IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMANDA MOORE,

     Plaintiff,

v.

PERFICIENT, INC.,

     Defendants.

CIVIL ACTION FILE NO.
1:20-cv-2124-SDG-CMS

## FINAL REPORT AND RECOMMENDATION

In this case, Plaintiff Amanda Moore complains that her former employer, Defendant Perficient, Inc., failed to accommodate her disabling conditions of anxiety and depression in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"). The accommodation that Moore sought was to travel less for her job. Moore also alleges that she was terminated either because she is disabled or in retaliation for requesting an accommodation under the ADA. Perficient has moved for summary judgment on all counts, arguing that Moore has failed to create a fact dispute as to the essential elements of her claims. [Doc. 71].

## I.  SUMMARY JUDGMENT FACTS & PROCEDURAL BACKGROUND

This factual statement is taken from the parties' summary judgment evidence. Because I am evaluating Perficient's motion for summary judgment, I have viewed

the evidence in the light most favorable to Moore, the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. *Moore's Employment with Perficient*

Moore began working for Perficient, a digital and information technology consulting firm in Atlanta, Georgia, in 2011, after Perficient acquired the company where she worked. [Doc. 71-12, Def. SMF ¶ 1]. At the time of the acquisition, Moore was a senior business consultant for a local client and was not required to travel. [Doc. 59, Pl. Dep. at 58–59].[1] After Perficient took over, Moore's job title changed to project manager. [SMF ¶ 2; Pl. Dep. at 59–62, 88]. As a consulting firm, Perficient's business model required it to track its employees' productivity based on their utilization rate, meaning the percentage of billable hours in relation to the employee's total hours worked. [Doc. 71-2, Declaration of Melanie Hoffman "Hoffman Decl." ¶ 6]. According to the project manager job description, the target utilization rate was 80%. [Doc. 71-3 at 1].

During her time at Perficient, Moore did consulting work for Wells Fargo (an assignment that included travel to Denver, Colorado), Comdata/Fleetcor (which was

---

[1] Moore's deposition is filed at Docket Numbers 59 (pages 1–139), 60 (pages 140–210), and 61 (pages 211–28 and exhibits). When citing to Moore's testimony in this Report and Recommendation, I have cited to the page of the transcript itself, rather than the CM/ECF header. With respect to the exhibits, however, I have cited to the docket number and page number on the CM/ECF header.

Atlanta-based), and Florida Blue (an assignment that included travel to Florida two weeks per month). [Hoffman Decl. ¶¶ 11–16].

Moore testified that although the thought of traveling made her anxious, "I was always a team player, [and] I always did what they asked me to do, even if it made me anxious." [Pl. Dep. at 62]. The job description for Perficient's project manager position includes a requirement that the individual have the "ability to travel to client sites as needed." [*Id.* at 64; Doc. 61-4 at 2]. Moore testified that she had a "proven track record" of being able to do her job remotely and of "not needing to necessarily travel" because she "could do all of this with technology." [Pl. Dep. at 64]. She recognized, however, that the decision about whether to have a project manager consultant like her on site was left to the client. [*Id.* at 65]. While working for Perficient, Moore often worked with clients on supply-chain issues that involved diagrams and visual aids in order to solve problems. [Hoffman Decl. ¶ 52]. Such clients, including her last client, Florida Blue, placed significant value in having Moore and other Perficient project managers in person at their respective workplaces. [*Id.* ¶ 52–53].

At Perficient, Moore was considered a billable employee who was responsible for billing her time. [Hoffman Decl. ¶¶ 4–6; Hoffman Dep. at 54]. According to Moore's supervisor, Melanie Hoffman, "billing for services is our business." [Hoffman Dep. at 56]. When billable employees were between assignments, they

were considered to be "on the bench" and not billing. [*Id.* at 54]. While "on the bench," Perficient's billable employees could assist with in-house work and attend various trainings. [*Id.*]. Hoffman testified that Perficient monitors utilization as well as the "bench report" on a weekly basis and that when someone is on the bench for extended periods of time, Hoffman has to report to the executive leadership team about a plan to "get them billable" again. [*Id.* at 56; Hoffman Decl. ¶ 6].

Moore's last work assignment with Perficient was the Florida Blue assignment in Jacksonville, Florida. The Florida Blue statement of work with Perficient specified that all work would be completed at the client's Jacksonville site unless otherwise specified. [Hoffman Decl. ¶ 54]. Initially, Moore worked two weeks per month in Jacksonville, but at some point, she was allowed to reduce it to one week per month. [*Id.* ¶¶ 16, 17; Doc. 66, Donovan Dep. at 26–27]. There is no dispute, however, that whether project managers like Moore had to be on site was a decision made by the client and that many of the projects that Perficient handled were outside the metro-Atlanta area.

On February 6, 2019, Moore wrote an email to her direct supervisor, Melanie Hoffman, explaining that Moore thought she had been asked to do something that was "unethical and a violation of our clients [sic] trust." [Doc. 61-16 at 1]. In the email, Moore also complained that she was being asked to travel to Florida more often than she wanted to, stating that she felt that "being onsite most weeks is not

really providing any additional value to the client." [*Id.* at 1–2]. At her deposition, Moore testified that her mental health issues had gotten worse while she was working on the Florida Blue project because of both the purported "unethical things" she was asked to do and the travel. [*Id.* at 156–57, 185].

Moore completed the Florida Blue project on March 15, 2019, at which point she no longer had to travel to Florida. [Pl. Dep. at 183; Doc. 61-17 at 1; Hoffman Decl. ¶ 18]. At that point, she did not have a billable project to work on. The plan was for her to work on a project with Comdata (a client that Moore had worked with previously), but that project fell through, leaving Moore "on the bench" and not billing. [Pl. Dep. at 183, 213–15; Hoffman Decl. ¶¶ 18, 24]. While "on the bench," Moore received full salary and benefits, but she billed no hours to clients, and thereby generated no revenue for Perficient. [Hoffman Decl. ¶ 19]. At Perficient, it was not uncommon for a project manager to be "on the bench" from time to time as they transitioned between projects. [Hoffman Dep. at 54; Pl. Dep. at 191–92].

While Moore was "on the bench" and not billing, she helped out with internal activities at work, such as preparing spreadsheets, pulling data, and going on sales calls; she was not traveling for work. [Pl. Dep. at 183–86, 215]. At her deposition, Moore could not recall how many hours a week she worked when she was "on the bench," answering, "I don't honestly remember" to the question of whether she worked more than ten hours a week. [*Id.* at 185–86]. Hoffman assigned Moore to

complete various training modules in order to make her more marketable to clients, and Moore completed some, but not all, of the training assignments. [Hoffman Decl. ¶¶ 20–21; Doc. 71-8 at 1]. It is undisputed that while Moore was "on the bench," Hoffman tried to find billable projects for Moore to work on, but all of the projects in Atlanta were either fully staffed or required a skill set different from Moore's. [Hoffman Decl. ¶¶ 23, 27].

On March 17, 2019, two days after Moore's involvement with the Florida Blue project ended, Hoffman offered Moore a project in Kansas City that required 75% travel for ten weeks, followed by 25% travel thereafter. [Doc. 61-18]. Moore declined the project, writing in an email:

> I cannot commit to 75% travel. Especially not this summer, as I have weekly commitments in Atlanta. Also, I would prefer to not work on a data intensive project. As stated before, I would like to focus on front end design and development lifecycle management.

[*Id.*]. In response, Hoffman wrote, "We will continue to look however I'm not seeing much in the pipeline for front end and development." [Doc. 71-9 at 1]. At her deposition, Moore was asked about her email. She testified that the reference to "weekly commitments" was to medical appointments for a breast cancer scare (second mammogram) and chronic sinusitis (follow-up visit to the ENT). [Pl. Dep. at 116–17]. Moore admitted that she never clarified to anyone at Perficient that the "commitments" to which she referred were actually medical appointments that would have prevented her from traveling. [*Id.* at 187]. She also admitted that

contrary to her statement in the email, she actually had no ongoing weekly commitments at that time. She testified, however, that she was trying to go to a therapist every week, trying to go to doctors, and trying to "get [herself] right." [*Id.* at 188].

Moore testified that she had suffered with sinus problems for "years and years and years," and that in 2019, she had been "sick with sinus problems for several months." [*Id.* at 175]. Also, at that time, her anxiety was "through the roof" because of the Florida Blue project she was working on. [*Id.* at 175–76]. She testified as follows regarding her email declining the Kansas City project:

> I didn't say no. I said that I couldn't commit to 75 percent travel. That was what that project was asking me for. 75 percent travel. I said I couldn't commit to 75 percent travel, because I had commitments in the Atlanta area. And those commitments were for me to try to find a counselor and a doctor, to address my medical issues.

[Pl. Dep. at 70].

On March 26, 2019, Moore updated her resume in Perficient's internal database to indicate that she would be willing to travel up to 25% of the time. [Def. SMF ¶ 19; Pl. Dep. at 153, 222–23]. When asked at her deposition why she did not change the percentage to zero, Moore stated that she knew that she was going to have to travel "a little bit to ramp up at a client site. My expectation was that I'd travel a week or two at the beginning of a project, and then you know, [go] to remote

work," as she had done for other clients. [Pl. Dep. at 223]. Moore testified that she was willing to travel to a client site for a limited time. [*Id.*].

While Moore was "on the bench," Hoffman also offered Moore a project with a client out of New York. [Hoffman Dep. at 56]. If Moore had been willing to relocate to New York City, it would not have required any travel. [Hoffman Decl. ¶ 29]. Moore declined the project. [*Id.*].

It is undisputed that at the time of Moore's termination, there were no local or non-travel assignments at Perficient that Moore could have worked on. [Pl. Dep. at 172; Hoffman Decl. ¶¶ 27, 33, 44]. Hoffman testified that due to Moore's low utilization rate and refusal of two projects, Hoffman spoke with her supervisor about what to do next and advised him that she did not see any Atlanta-based projects in the near future. [Hoffman Decl. ¶¶ 45, 46]. After discussing the problem, Hoffman and her supervisor decided to terminate Moore's employment. [*Id.* ¶ 47].

On April 17, 2019, Perficient terminated Moore's employment and reported to the Georgia Department of Labor that the reason for the termination was "lack of work." [Doc. 70-1]. Perficient paid Moore two weeks of severance pay. [*Id.*].

Moore then filed an EEOC Charge, checking the boxes for retaliation, disability, and "other." [Doc. 70-2]. During the EEOC investigation, Perficient took the position that Moore was terminated for performance reasons, that Perficient had received complaints from multiple clients about her performance, and that Moore

was not billing enough hours as was required in her position.  [Doc. 75-2 at 3].  Later, in Perficient's verified interrogatory response to an interrogatory asking for the reason(s) for Moore's termination, Perficient again stated that Moore was terminated due to performance reasons and also noted "attitude issues." [Doc. 69-1 at 6–7].

### B. Evidence of Plaintiff's Mental Health Issues

According to her deposition testimony, Moore was diagnosed with depression and anxiety in 1999, and with social anxiety in 2010.  [Pl. Dep. at 193–95].  Moore testified that her anxiety causes her to have panic attacks, heart palpitations, rapid breathing, shakiness, nausea, sweating, vomiting, and difficulty thinking or putting thoughts together.  [Pl. Dep. at 15, 16, 45, 96, 160, 194].  Her symptoms also included suicidal thoughts and difficulty getting out of bed.  [*Id.* at 194].  During her early years working for Perficient, Moore was taking "a very high dose of Zoloft," but during the summer of 2018, she elected to wean herself off of the medication.  [*Id.* at 12–13, 137].  After consultation with her doctor, several pharmacists, and medical journals over the course of approximately six weeks, Moore reduced her Zoloft intake from 200 milligrams to zero.  [*Id.* at 13, 138].  Her doctor gave her "alternate ways" to treat her anxiety and depression.  [*Id.* at 137–38].  Thus, from the fall of 2018 until her termination from Perficient in April 2019, Moore was not taking any prescribed medication.  [*Id.* at 25].  By the time of her deposition in June

2021, Moore had started back taking "a very low dose of Zoloft," 25 milligrams. [*Id.* at 11]. She also had a prescription for Valium, but rarely took it. [*Id.* at 14–16].

Moore claims that travel triggers her anxiety. [Pl. Dep. at 42–43 ]. Moore testified that travel made her worry "about packing or forgetting to bring something" and about the unknowns associated with travel, such as missing a flight, securing a rental car, and being on time to client meetings. [*Id.* at 42–43, 53–55, 69, 162]. She testified that before traveling for work, she lay awake at night thinking about whether she had packed the right clothing and equipment and worrying about traffic. [*Id.* at 54]. Moore testified that personal travel also causes her anxiety, but admitted that she had taken several vacations between the time after she was terminated and the time of the deposition. [*Id.* at 55]. Moore explained that traveling for pleasure was different than traveling for work because she knew she had a support system when she traveled for pleasure and it was the "work conditions" that induced her panic attacks. [*Id.* at 55–56, 207].

The following is undisputed: Moore never spoke with a medical professional about her belief that work-related travel made her anxiety worse; no doctor has ever told Moore that travel exacerbates (or exacerbated) her panic attacks; and Moore has never asked her doctor for a note to get an accommodation at work from her employer. [*Id.* at 109–10, 163, 201–03]. The only medical evidence in the record is a note from an initial visit to a doctor on January 17, 2019, when Moore

complained primarily of sinus pressure, headaches, nasal congestion, fever, cough, and post-nasal drip. [Doc. 62-21 at 1]. The doctor diagnosed Moore with sinusitis and prescribed an antibiotic. [*Id.* at 8]. During the visit, Moore and the doctor also discussed Moore's anxiety. The physician's treatment notes state, in part:

**Anxiety**

Presents for initial visit. Onset was more than 5 years ago. The problem has been gradually improving. Symptoms include excessive worry, insomnia, irritability and nervous/anxious behavior. Patient reports no chest pain, decreased concentration, depressed mood, dizziness, feeling of choking, hyperventilation, obsessions, palpitations, panic, shortness of breath or suicidal ideas. Symptoms occur occasionally. The severity of symptoms is interfering with daily activities and moderate. The symptoms are aggravated by social activities. The quality of sleep is good. Nighttime awakenings: occasional.

Her past medical history is significant for anxiety/panic attacks. There is no history of suicide attempts. Past treatments include SSRIs. The treatment provided moderate relief. Compliance with prior treatments has been good.

[Doc. 61-21 at 1]. Notably absent from this recitation is any reference to travel-induced or travel-related panic attacks. Based on Moore's self-reported history and physical examination, the doctor assessed Moore as having "severe anxiety" and "moderate depression" and wrote Moore a prescription for Valium. [*Id.* at 4, 8]. Despite receiving a list of potential therapists from her primary care physician, Moore did not set up an appointment with a therapist, even during the month when she was "on the bench" and not traveling for work. [Def. SMF ¶ 28].

Moore testified that "[t]he traveling was making—was making my anxiety and depression worse. And specifically, the assignment down at Florida Blue where they were asking us to do unethical things. That was really making my anxiety go through the roof." [Pl. Dep. at 156–57].

Moore also testified that traveling was not the only thing that triggered her anxiety; rather, "there's a myriad of things that can trigger my anxiety." [Pl. Dep. at 43, 54, 162]. Moore testified that other triggers for her anxiety include meeting with a client for the first time, being on a stressful work call, and going to a new client site. [*Id.* at 54]. She testified, "I mean, [travel is] not the only thing that makes my anxiety worse. But traveling definitely makes it way worse." [*Id.* at 162]. There is no evidence that Moore ever discussed any of what she considered to be triggers with anyone at Perficient.

At her deposition, Moore explained that the reason she did not want to travel in March and April 2019 was that she had "medical issues" that she needed to address in the Atlanta area: "I was having panic attacks when I was leaving every other week to go to Jacksonville." [Pl. Dep. at 68]. It is undisputed that notwithstanding her anxiety, Moore was always able to travel to the client's site and perform the work assigned to her. [Def. SMF ¶ 10].

Moore testified that she traveled for work, even though it caused her to cry on the way to the airport and to suffer heart palpitations. [Pl. Dep. at 69]. Moore

testified that she had panic attacks before she worked for Perficient (when she was not traveling for work), as well as after she worked for Perficient. [*Id.* at 140].

At her deposition, Moore testified about three specific instances where she had a panic attack during work for Perficient. [Pl. Dep. at 96, 138–39, 160–61, 167–69]. The first incident occurred in 2011 in Charlotte, North Carolina. [*Id.* at 96]. According to Moore, a coworker recognized that Moore was having a panic attack and put a water bottle on her head. [*Id.* at 95–97]. The second incident happened seven years later, in April 2018 in Nashville, Tennessee, when Moore was traveling for work with Hoffman. Moore woke up in the hotel and felt dizzy and nauseous. When Hoffman arrived at the hotel to pick Moore up, Moore texted, "I'm having a hard time this morn. Every time I stand up I get dizzy." [*Id.* at 138–39, 160–61, 167–69; Hoffman Dep. at 72]. Hoffman had to go to Moore's room to help Moore get to the car. [Pl. Dep. at 160, 168]. The third incident was a panic attack in September 2018 in Jacksonville, Florida, that was triggered when Moore ran into her Florida Blue supervisor, Dave Donovan, while at breakfast at her hotel. [Pl. Dep. at 104]. She testified that although she expected to see Donovan at work, she was surprised to see him at the hotel. She left and started crying because seeing Donovan caused her to be anxious about work problems, but she never told Donovan that she suffered a panic attack. [*Id.* at 105–06, 109].

### C. Evidence of Perficient's Knowledge of Moore's Mental Health Issues and Moore's Request to Travel Less Because of It

Moore contends that she made multiple verbal requests for an accommodation to Hoffman, her supervisor.[2] [Pl. Dep. at 83, 85]. Although she testified in general terms about letting Hoffman know that she wanted to "get off the road," there is evidence of only one specific verbal request tied to her anxiety or panic attacks—in the car with Hoffman in Tennessee in April 2018, nearly a year before Moore was terminated. [*Id.* at 138–39, 155, 160, 169]. With respect to that conversation, Moore testified as follows:

> I told [Hoffman] that I was having panic attacks while I was on the road. And she witnessed a panic attack while I was on the road. So I told her I needed to be–you know, have a local physician so that I could deal with these panic attacks that I was having.

[Pl. Dep. at 139–40]. According to Moore's testimony, during that Tennessee trip, Moore told Hoffman that she needed to travel less so that she could address her medical issues and seek treatment for her depression and anxiety. [Pl. Dep. at 167–69, 187–88; Hoffman Dep. at 74; Doc. 61-6 ¶ 12; Doc. 61-14; Doc. 75-1, Declaration of Amanda Moore ("Pl. Decl.") ¶¶ 6, 8]. Moore testified that Hoffman told her that she "understood that [Moore] was in an unhealthy work environment" in Florida

---

[2] Plaintiff testified that she also told Dave Donovan that she needed to travel less, but she did not tell him that it was because of her anxiety or any other medical issue. [Pl. Dep. at 67–68, 82–84, 92, 102, 170].

because "they were asking her to do unethical things." [Pl. Dep. at 156–57].

According to Moore, during that conversation, Hoffman told Moore that she "would

try to get [Moore] off the road." [*Id.* at 169]. Moore described her requests as

follows:

> I was having medical issues. I asked to be accommodated. For several
> months I asked to be accommodated and asked to be taken off the road
> because I needed to seek medical attention here in Atlanta. . . . I mean
> when I started asking for accommodation to not travel. That was, you
> know, late 2018, early 2019.

[Pl. Dep. at 33–34].

Moore testified that in her view, every time she requested to work remotely,

travel less, or be given a non-travel assignment, she was asking for an

accommodation for her anxiety-induced panic attacks. [Pl. Dep. at 90, 139–40]. For

example, Moore testified as follows:

> Q. Well, is there any sort of written documentation, or any evidence in
> general, where you spoke, or where you asked Ms. Hoffman, "I can still
> travel, but I just don't want to travel as much."
>
> A. Not written, to my knowledge, no.
>
> Q. How many times -- obviously, you allege that you told her that
> verbally, correct?
>
> A. Correct.
>
> Q. How many times did you tell her that, supposedly?
>
> A. Several times I asked to be removed from traveling assignments. I
> don't have a specific number off the top of my head, but I asked her
> several times.

Q. More than five?

A. Maybe.

Q. Well. More than three?

A. Probably more than three, yes.

Q. Okay. When you would make those requests, did you mention that you wanted to stop traveling, or travel less, because of these purported disabilities?

A. I believe so.

Q. You don't remember?

A. I mean, I know I told her on at least one occasion, one or two occasions, that I was having medical issues and that I needed to be off the road so that I could seek help with those.

[*Id.* at 153–54].

Although Perficient disputes that Moore tied her requests to travel less to her anxiety, it is undisputed that Moore asked to travel less and that Hoffman repeatedly told Moore that she (Hoffman) was trying to find Moore a non-travel assignment. [Pl. Dep. at 79–81; Hoffman Dep. at 57–58, 60, 67]. It is also undisputed that Hoffman tried to find a non-travel assignment for Moore but that none existed in the month leading up to Moore's termination. [Pl. Dep. at 80–81]. It is also undisputed that although other people in Moore's unit had Atlanta-based assignments, all those positions were filled during the month leading up to Moore's termination. [*Id.*].

In her discovery responses and later in her deposition, Moore stated that her request to travel less was based on her need to find a therapist and that she could not find one without a reasonable accommodation. [Pl. Dep. at 111, 151]. After testifying that she "needed to be in town to make appointments with therapists and doctors," the following exchange occurred:

Q. Now, help me understand why you couldn't find a therapist without a reasonable accommodation.

A. Because I needed to be in town to make appointments with therapists and doctors.

Q. Okay. And at that point, what percentage of the time were you traveling?

A. Every other week.

Q. What prevented you from scheduling therapy appointments in the weeks that you were in town?

A. Availability of the doctors and the therapists.

Q. Did you have one specific therapist in mind that could not do any of those schedules?

A. No, I was in the process of finding a therapist when I was terminated.

Q. Which therapists were you communicating with?

A. I had a list of them, and I was about to start contacting all of them when I was terminated. I was working with my doctor and my doctor provided me a list.

[*Id.* at 111–13]. Moore was shown a copy of the list, which was dated February 6, 2019. Moore conceded that that she never contacted any of the therapists on the list, even though she was "on the bench" and not working more than a few hours a week from March 13 (when she returned from the Florida Blue project) until April 17 (the date she was terminated). [*Id.* at 113–14, 116]. When questioned about this, Moore explained that during this time period, she had a breast cancer scare and suffered from sinusitis.[3] [*Id.* at 116].

### D. Procedural Background

In her Amended Complaint, Moore alleges violation of the ADA in three distinct ways. In Count One, she alleges that she was terminated because of her mental health impairments, which she alleges amount to a disability under the ADA. [Am Compl. ¶¶ 48–67]. In Count Two, Moore alleges that Perficient did not allow her to perform assignments that did not require regular travel and thereby failed to accommodate her disability. [*Id.* ¶¶ 68–85]. And, in Count Three, Moore alleges that Perficient illegally terminated her employment in retaliation for requesting an accommodation for her disability. [*Id.* ¶¶ 87–101]. Each of these counts requires different evidence and must be addressed separately.

---

[3] Even after losing her job with Perficient, Moore never contacted a therapist. [Pl. Dep. at 21–22, 119–22].

18

## II. DISCUSSION

### A. *Summary Judgment Legal Standard*

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *Adickes*, 398 U.S. at 158–59.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed facts. *See Anderson*, 477 U.S. at 249. Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are not. *Id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

### B. COUNT ONE – Discrimination (Termination)

In Count One of her Amended Complaint, Moore alleges that she suffers from a disability within the meaning of the ADA, and that Perficient "treated other employees outside Plaintiff's protected class differently." [Am. Compl. ¶¶ 48–67]. She alleges further that she was terminated "because of" her disability. [*Id.* ¶ 55].

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1), (b)(2). Title I of the ADA, which covers disability discrimination in employment, prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a prima facie case for disability discrimination, a plaintiff must produce sufficient evidence to permit a jury to find that she: (1) suffers from a "disability," as defined under the ADA; (2) is a qualified individual; and (3) was subjected to unlawful discrimination "because of" the disability. *See Lewis v. City of Union City,* 934 F.3d 1169, 1179 (11th Cir. 2019). Where, as here, there is no direct evidence of discrimination, a circumstantial case of discrimination may be made using the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" by the employer. *See Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011).

In its motion for summary judgment, Perficient argues that Moore cannot make out any of the elements of her prima facie case, and that she loses under the *McDonnell Douglas* analysis. In response, Moore argues that summary judgment on this claim should be denied because she has come forward with evidence that she is a qualified individual with a disability and that there is a convincing mosaic of disability discrimination. [Doc. 75 at 15–27].

### 1. <u>Disability</u>

Under the ADA, a person has a "disability" if, among other things, she has a physical or mental impairment that substantially limits a major life activity. 42

U.S.C. § 12102(1) (defining "disability"). Such an impairment is one that significantly limits or restricts a major life activity such as hearing, seeing, speaking, breathing, performing manual tasks, walking, caring for oneself, learning or working. *See* 42 U.S.C. § 12102(2).

In 2008, Congress passed the ADA Amendments Act of 2008 ("ADAAA") to expand the coverage of the ADA and make it easier for plaintiffs to establish that a serious medical condition is covered as a disability under the ADA. "[B]y enacting the ADAAA in 2008, Congress eased in part the evidentiary burden on ADA plaintiffs," and "announced that 'the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Vaughan v. World Changers Church Int'l, Inc.*, No. l:13-cv-0746-AT, 2014 WL 4978439 (N.D. Ga. Sept. 16, 2014) (quoting *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014)).

Here, the record contains ample evidence that Moore suffers from the mental impairment of anxiety.[4] She has come forward with medical evidence showing that she was diagnosed with "severe anxiety" in January 2019, shortly before she was

---

[4] In her Amended Complaint, Moore also alleges that her diagnosed condition of depression also amounts to a disability. [Am. Compl. ¶ 20]. The record, however, contains no evidence that depression limited any life activities. All of the evidence presented concerns her anxiety and panic attacks. As such, I will limit my discussion to Moore's diagnosed condition of anxiety.

terminated, and there is evidence that at least one physician has prescribed medication and other therapies to help control the anxiety. [Doc. 61-21 at 4; Pl. Dep. at 12–13, 137–38]. Although at the time of her termination Moore was not taking any prescribed medication, she was back on medication by the time of her deposition in June 2021. [Pl. Dep. at 11, 14–16, 25].

Moore testified that her anxiety caused her to be "irritable, and disorganized, and flustered" and that at times she had "[d]ifficulty concentrating, difficulty, you know, getting my thoughts out." [Pl. Dep. at 39]. And she points to evidence that she suffers from panic attacks stemming from her anxiety. [*Id.* at 15–16, 45, 96, 160, 194]. According to Moore, her panic attacks caused heart palpitations, rapid breathing, shakiness, nausea, sweating, vomiting, and difficulty thinking or putting thoughts together. [Pl. Dep. at 15, 16, 45, 96, 160, 194]. She also testified that her symptoms include suicidal thoughts and difficulty getting out of bed, and her physician noted that Moore's anxiety could be exacerbated by social activities. [*Id.* at 194; Doc. 61-21 at 1–2].

In terms of its limiting effects, Moore claims that her anxiety-induced panic attacks substantially limit her participation in the major life activities of concentrating, thinking, working, and interacting with others. [Doc. 75 at 16]. The regulations implementing the ADAAA provide:

> The term "substantially limits" shall be construed broadly in favor of
> expansive coverage, to the maximum extent permitted by the terms of

the ADA. "Substantially limits" is not meant to be a demanding standard . . . .

The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(1)(i), (iii).

In its motion for summary judgment, Perficient points out that prior to her termination, Moore performed her consulting job and traveled to various client locations for the previous eight years of her employment without an accommodation. [Doc. 71-1 at 9]. Perficient argues that because Moore's anxiety never rendered her unable to perform her job duties, she does not suffer from a qualifying disability under the ADA. [*Id.* at 9–10]. In making this argument, Perficient cites to pre-ADAAA case law and applies the wrong legal standard. Under the more liberal standard established by the ADAAA, the fact that Moore was able to do her job does not mean that she does not suffer from a "disability" for purposes of the ADA. If an impairment is episodic, it "is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). Moreover, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* § 1630.2(j)(1)(ii).

In light of Moore's testimony regarding her disabling (albeit occasional and episodic) panic attacks brought on by her anxiety, and Congress's intention to broaden the definition of what constitutes a disability, a reasonable jury could find that Moore has an impairment that amounts to a "disability" under the ADA and ADAAA.  *See* 29 C.F.R. § 1630.2(j)(i) (stating that the term "substantially limits" is not meant to be a demanding standard and that it should be construed broadly in favor of expansive coverage).  Thus, I will assume that Moore has satisfied the "disability" portion of her prima facie case.

### 2.  Qualified Individual

To survive summary judgment on this claim, Moore must also come forward with evidence to show that she is a "qualified individual." 42 U.S.C. § 12112(a). The ADA defines the term "qualified individual" as follows:

> The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

Perficient recognizes that Moore was always able to do her job, yet it nevertheless argues that she was not a qualified individual because travel is an essential function of her job.  Perficient cites to the job description, which states that

25

project managers must have the "ability to travel to client sites as needed." [Doc. 61-4 at 2]. Perficient also notes that whether a project manager must be on site is a decision left to the client. [Doc. 71-1 at 13–14].

In making this argument, Perficient ignores the ample evidence in the record that not all project-manager assignments required extensive travel. For example, there is evidence that (1) some project-manager assignments at Perficient could be done remotely or with relatively little travel (although it is undisputed that there were no such available assignments at the time Moore was terminated) [Doc. 68, Beine Dep. at 61; Doc. 65, Weaver Dep. at 15; Doc. 66, Donovan Dep. at 26–27]; (2) some project-manager assignments at Perficient were based in Atlanta (although it is undisputed that all of those positions were filled at the time Moore was terminated) [Hoffman Dep. at 65; Pl. Dep. at 167–69]; (3) some clients would allow their project managers to work remotely, upon request [Donovan Dep. at 26]; (4) Perficient's project-manager job description distinguishes between "traveling colleagues" versus "nontraveling colleagues" [Doc. 61-4 at 3]; (5) project managers were asked to indicate on their internal resumes how much travel they were willing to perform on an assignment [Doc. 61-24 at 3]; (6) Moore had successfully worked remotely at times during her employment with Perficient [Hoffman Dep. at 64; Donovan Dep.

at 26–27]; and (7) Hoffman was actively trying to locate a non-travel assignment for Moore while Moore was "on the bench" [Pl. Dep. at 79–81].

Given these facts, a reasonable jury could conclude that project managers who were willing and able to travel had more options in terms of potential assignments, but that the ability to travel was not necessarily essential to the job. As such, a reasonable jury could conclude that Moore was a qualified individual, as that term is used under the ADA. Thus, Moore has satisfied the second prong of her prima facie case.

### 3. Termination "Because of" a Disability

The Eleventh Circuit has explained that a plaintiff will survive summary judgment if she can present circumstantial evidence to create a triable issue concerning the employer's discriminatory intent. *Smith*, 644 F.3d at 1328. "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). The "convincing mosaic" allows the court to consider relevant evidence of discrimination that does not fall within the ambit of the traditional prima facie case under *McDonnell-Douglas*, and to permit a plaintiff's claim to proceed where she is unable to meet one of the prima facie elements under *McDonnell-Douglas* but nevertheless presents sufficient circumstantial evidence of

discrimination. *See Scott v. Soc. Involvement Missions, Inc.*, No. 1:17-4963-AT-CCB, 2020 WL 7237702, at \*4 (N.D. Ga. Dec. 9, 2020). According to the Eleventh Circuit:

> A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.

*Lewis,* 934 F.3d at 1185.

Here, Moore points to the timing of her termination and to Perficient's various justifications for her termination to show a convincing mosaic of intentional disability discrimination. [Doc. 75 at 21–27].

### a. The timing of Moore's termination

Moore first argues that the timing is suspicious in this case because (1) she was terminated "shorty after renewing [her] request" to travel less; and (2) she was kept "on the bench" for only one month while others were allowed to stay "on the bench" for longer. [Doc. 75 at 24].

To the extent that Moore is arguing that she was terminated shortly after making an ADA-protected request to accommodate her anxiety, the evidence does not support this argument. The evidence shows that on one occasion in April 2018, Moore verbally asked Hoffman to travel less after suffering a panic attack while the two were traveling for work. I have construed this evidence in Moore's favor to

conclude that this discussion amounted to a specific request for an accommodation. The rest of Moore's evidence concerning what she told Hoffman about her anxiety, however, is vague. For example, Moore testified: "Several times I asked to be removed from traveling assignments. I don't have a specific number off the top of my head, but I asked her several times." [Pl. Dep. at 154]. But when asked whether she mentioned her anxiety in connection with her desire to stop traveling, Moore was equivocal, answering, "I believe so. . . I know I told her on at least one occasion, one or two occasions, that I was having medical issues and that I needed to be off the road so that I could seek help with those." [*Id.* at 153–54]. Her reference to "medical issues" is notably vague in light of the evidence that Moore had other physical problems at the time, in addition to her anxiety.

Additionally, Moore appears to be relying on her email in which she refused the Kansas City assignment to support her argument that the timing was suspicious. [Doc. 75 at 24]. In that email, however, Moore does not mention her anxiety or any other medical condition; rather, she simply said she did not want to travel during the summer and wanted a different type of assignment:

> I cannot commit to 75% travel. Especially not this summer, as I have weekly commitments in Atlanta. Also, I would prefer to not work on a data intensive project. As stated before, I would like to focus on front end design and development lifecycle management.

[Doc. 61-18]. There is no mention of travel-induced anxiety or panic attacks, and nothing about this email indicates that it is a specific request for an accommodation.

Moore also argues that the timing is suspicious because other Perficient employees were allowed to stay "on the bench" for much longer than a month without being terminated. [Doc. 75 at 24, 26]. However, there is no competent evidence in the record to support this assertion. While the parties agree that it was not uncommon for project managers to be "on the bench" from time to time as they transitioned between projects [Beine Dep. at 28–30; Hoffman Dep. at 54], there is no evidence in the record of project managers being "on the bench" indefinitely, with no assignments on the horizon. In her declaration in support of her response to the motion for summary judgment, Moore states that in the past, she previously had been "benched" at least two times for a period between six to ten weeks.[5] [Pl. Decl. ¶ 4]. Perficient employee Stacy Beine testified that the time "on the bench" would typically be no longer than six weeks. [Doc. 68, Beine Dep. at 30]. Moore's supervisor, Melanie Hoffman, testified that "[f]our weeks is a pretty long time to be

---

[5] During her deposition, Moore testified that "I've seen people go six months to a year being on the bench," but she was unable to provide any specifics, such as a name or a job title of such people. [Pl. Dep. at 191–92]. In her declaration filed in connection with the motion for summary judgment, Moore does not include this statement or bolster it in any way. This general assertion is insufficient to create a fact dispute regarding whether Perficient allowed its billing employees to go for a such a long period of time without billing. In the absence of any specific evidence to support Moore's "six months to a year" assertion, it appears to be pure speculation that cannot create a fact issue for summary judgment purposes. *See Gadsby v. Am. Golf Corp. of Cal.*, 557 F. App'x 837, 840 (11th Cir. 2014) (per curiam).

on the bench" and that some people are terminated after two weeks "if there's no line of sight." [Hoffman Dep. at 58]. Hoffman recalled firing an employee (Tonya Jackson) for being "on the bench" for four weeks. [Hoffman Dep. at 58–59]. Moore has come forward with no evidence to challenge Perficient's evidence on this point, nor any specific examples of people being "on the bench" indefinitely.

Given this testimony, and the reality that employees "on the bench" received their full salary and benefits while not generating any revenue for the company, there is nothing inherently suspicious about Moore being terminated after being "on the bench" for four weeks. This is especially true here, where there were no non-travel (or limited-travel) assignments in the pipeline, and there is no evidence that any such assignments actually materialized in the weeks or months following Moore's termination.

### b. Perficient's "shifting reasons" for the termination

Finally, Moore argues that summary judgment should be denied because after Moore was terminated, Perficient provided "shifting reasons" for its decision to terminate Moore's employment. [Doc. 75 at 24–27]. At the time of Moore's termination, the stated reason was "lack of work." [Doc. 70-1]. In its EEOC position statement, Perficient stated that Moore was terminated for performance reasons and that there had been complaints from multiple clients about her performance. [Doc. 75-2 at 3]. Then later, in a verified interrogatory response to an interrogatory asking

Perficient to state the reason(s) for Moore's termination, Perficient averred that Florida Blue had asked that Moore be removed from its account due to "performance and attitude issues."[6] [Doc. 69-1 at 6–7]. Moore argues that "Perficient put forth a story for two years that was completely baseless and a total lie." [Doc. 75 at 7]. This lie, Moore argues, is part of a convincing mosaic of discrimination.

The problem with Moore's argument is that there was no work for her to do at the time she was terminated. Moore has cited no authority that would require Perficient to provide evidence of additional reasons for her termination where the reason stated at the time of the termination—"lack of work"—is undisputed. Moreover, the additional reasons provided in the interrogatory response are not inconsistent with the undisputed fact that there were no assignments available for her. Nor are those additional reasons wholly unsupported by the record. There is evidence Moore had been vocal about problems she had with the Florida Blue account, that she wanted to be removed from the account, and that her utilization rate was low because she had not billed any time for a month before her termination.

---

[6] Moore also complains that in its interrogatory response, Perficient incorrectly stated that Moore was "on the bench" for three months, when she was actually on the bench for only one month. [Doc. 75 at 6; Doc. 69-1 ¶ 5]. I find this error unremarkable and/or harmless. During her deposition, Moore also incorrectly remembered the time period between the end of her Florida Blue assignment and her termination. [Pl. Dep. at 191 (testifying that she was "on the bench" for two months during that period)]. In my view, nothing about these errors supports an inference of discrimination or "shifting reasons" for her termination.

The existence of additional reasons for terminating an employee, even if those reasons were undisclosed at the time of her discharge, does not prove pretext, especially where, as here, one of those reasons is undisputed. *See Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1458–59 (11th Cir. 1997) (per curiam) (holding that if an employer offers different reasons for terminating an employee, those reasons must be fundamentally inconsistent in order to constitute evidence of pretext); *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998) (noting that "the existence of a possible additional non-discriminatory basis for Tidwell's termination does not, however, prove pretext"). Given the evidence in the record, Moore's so-called "shifting reasons" evidence is insufficient to amount to a convincing mosaic of circumstantial evidence of disability discrimination.

In reaching this conclusion, I have reviewed numerous decisions where district courts denied summary judgment based on the convincing mosaic analysis. In those cases, there are usually multiple pieces of evidence that, viewed together, might suggest discrimination. This evidence tends to be "bits and pieces" of evidence of ambiguous statements and suspicious timing that could support an inference of discrimination. *See Lewis*, 934 F.3d at 1185.

For example, in *Lockheed-Martin*, the Eleventh Circuit reversed the trial court's grant of summary judgment, ruling that the plaintiff did not need to rely on the *McDonnell Douglas* presumption to establish a case for the jury. The Court

noted that although the evidence did not fit neatly into the *McDonnell Douglas* framework, the "convincing mosaic" of circumstantial evidence presented by the plaintiffs was overwhelming and included: a documented history of disparate treatment of Caucasian and African-American employees; a spreadsheet listing employees under investigation by name and race that the defendant's disciplinary review committee used to make disciplinary decisions; and a news program reporting the defendant's struggles with racism in the workplace, which focused on violence by a white supremacist. *See Lockheed-Martin*, 664 F.3d at 1329–40. Similarly, in *Scott v. Social Involvement Missions*, No. 1:17-cv-4963-AT, 2020 WL 7685222, at *9 (N.D. Ga. Jan. 21, 2020), Judge Totenberg denied summary judgment, using the convincing mosaic theory, where an employer told a pregnant woman that she was going to be put on unpaid FMLA leave in part because the employer did not want "any liabilities" or "legal actions" and where the employer could have easily accommodated the plaintiff's pregnancy but chose not to. In *Lee v. Christian*, 221 F. Supp. 3d 1370, 1378 (S.D. Ga. 2016), a district judge denied a motion for summary judgment without evidence of a comparator where the evidence included several comments that reflected gender bias and evidence of secret meetings. In *Spriggs v. Mercedes Benz USA, LLC*, No. CV-213-051, 2014 WL 4808852, at *14 (S.D. Ga. Sept. 26, 2014), a district judge denied a summary judgment motion, citing the convincing mosaic theory, where there was evidence

that one manager told the plaintiff that two other managers had taken disciplinary action against the plaintiff based on the plaintiff's race. The court ruled that even though the plaintiff had no comparator evidence, this evidence was significant enough to cast doubt on the managers' stated reasons for terminating the plaintiff. In *Norris v. GKN Westland Aerospace, Inc.*, 921 F. Supp. 2d 1308, 1314 (M.D. Ala. 2013), a district judge found circumstantial evidence of discriminatory intent where an employer transferred an employee immediately following a discussion of the employee's medical condition, while other employees were not transferred. And in *Hale v. Univ. of Ala. Bd of Trs.*, No. 2:16-cv-00498-RDP, 2018 WL 4215595, at *9 (N.D. Ala. Sept. 5, 2018), a district judge denied summary judgment under the convincing mosaic theory where there was evidence that the timing of the plaintiff's termination was suspicious; the defendant engaged in preferential treatment of non-black employees; and the defendant provided a pretextual justification for the plaintiff's termination.

In contrast to these cases, Moore has come forward with no evidence of discriminatory or offensive comments, no secret meetings, no irregular procedures, and nothing else that might show discriminatory animus on the part of any Perficient employee. As discussed above, there is nothing suspicious about the timing of Moore's termination because Moore had not billed for a month; her last specific request for a travel-related accommodation was in April of 2018; there were no

available assignments for her that met her need to travel less; and there were no such assignments in the foreseeable future. There is no evidence that an individual without a disability replaced Moore or was retained under similar circumstances. The fact that after Moore was terminated, Perficient stated that Moore had performance and attitude issues does not tip the analysis in Moore's favor in the absence of anything to suggest unlawful discrimination.

The problem for Moore on her discriminatory discharge claim is not in the putative rigidity of the *McDonnell Douglas* prima facie case. Rather, it is that Moore fails to point to any evidence of discriminatory intent or animus on the part of any Perficient employee that would allow a jury to find in her favor. The fact that during the EEOC proceedings and in this litigation, Perficient articulated additional reasons to justify Moore's termination is insufficient, standing alone, to create a convincing mosaic of discriminatory intent. It is not Perficient's burden to establish the validity of every reason it has ever articulated for Moore's termination. Rather, it is Moore's burden to come forward with some evidence to suggest illegal discrimination.

Because the circumstantial evidence that Moore points to falls short of forming a convincing mosaic of disability discrimination, I will recommend that Perficient's motion for summary judgment be granted as to her disability discrimination claim set forth in Count One.

### C. COUNT TWO— *Discrimination (Failure to Accommodate)*

In Count Two, Moore alleges that she is a qualified individual with a disability, that she requested an accommodation for her disability that would have allowed her to perform assignments without having to travel regularly, and that upon receiving the request, Perficient failed to engage in any interactive process regarding the request, failed to provide a reasonable accommodation, and terminated her employment. [Am. Compl. ¶¶ 68–85].

The ADA's prohibition on disability discrimination includes a failure to provide a reasonable accommodation to the limitations of an individual with a disability. *See* 42 U.S.C. § 12112(b)(5)(A) ("the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity").

For discrimination claims based on the failure to provide a reasonable accommodation for the employee's disability, the *McDonnell Douglas* burden-shifting framework does not apply. *See Nadler v. Harvey, No. 06-12692,* 2007 WL 2404705 (11th Cir. Aug.24, 2007); *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007); *Jones v. Ga. Dep't of Corrs.*, No. 1:07-cv-1228,

2008 WL 779326, at *6 (N.D. Ga. Mar. 18, 2008). Rather, to survive summary judgment on a failure-to-accommodate claim, a plaintiff must produce sufficient evidence to permit a jury to find that she is a qualified individual who suffers from a "disability," as that term is defined under the ADA and ADAAA, who made a specific request for an accommodation and was denied a reasonable accommodation. *Frazier-White v. Gee*, 818 F.3d 1249, 1255–56 (11th Cir. 2016).

### 1. **Qualified Individual with a Disability**

As discussed above, I have already concluded that Moore has provided sufficient evidence to at least create a fact dispute as to whether she is a qualified individual with a disability.

### 2. **Sufficiently Specific Request**

The next element is whether Moore made a sufficiently specific request for an accommodation. The request must both be specific and must explain how the accommodation requested is linked to the disability. *Palmer v. McDonald*, 824 F. App'x 967, 979 (11th Cir. 2020). "For a request to be sufficiently specific, it does not have to employ any magic words, but the request must be definite enough that under the circumstances, the employer can be said to know of both the disability and

desire for an accommodation." *Laun v. Bd. of Regents of Univ. Sys. of Ga.*, No. CV 118-033, 2019 WL 4694940, at *9 (S.D. Ga. Sept. 25, 2019).

Moore has acknowledged that she never made any written request for an accommodation of any disability. [Pl. Dep. at 153–54]. There is evidence, however, that in April 2018, Hoffman saw Moore suffer from an anxiety-induced panic attack while on a work trip and that afterwards, Moore told Hoffman that she wanted to travel less in order to reduce her anxiety.[7] [Pl. Dep. at 139–40, 153–55, 160, 167–69, 187–88; Doc. 75-1, Pl. Decl. ¶¶ 6, 8]. There is also evidence that Hoffman understood the request and was trying to locate a non-travel assignment for her. [Pl. Dep. at 79–81]. Viewing these facts in the light most favorable to Moore, I conclude that the April 2018 conversation in the car amounts to a sufficiently specific request to accommodate Moore's anxiety.

---

[7] The evidence certainly is not clear on this point. When Moore requested to travel less, she also told Hoffman that other things caused her anxiety, such as being asked to do unethical things. [Pl. Dep. at 156–57]. Moreover, Moore testified that she wanted to travel less because of her other health concerns, such as her sinusitis and her breast cancer scare. [*Id.* at 116]. Based on the evidence in the record, a reasonable factfinder could conclude that Moore's dislike for the Project Blue assignment and/or her other (nondisabling) medical conditions were the real reasons that Moore requested to travel less in 2018 and 2019, and therefore she did not make a sufficiently specific request for an accommodation for her anxiety that would be recognized under the ADA. *See Owens v. Governor's Off. of Student Achievement*, No. 1:19-cv-5683, 2021 WL 4286460, at *5 (N.D. Ga. Sep. 17, 2021) (finding an insufficient link between the requested accommodation and the disability). At this stage of the litigation, however, the facts must be viewed in the light most favorable to Moore, the non-movant.

### 3. <u>**Was Moore Denied a Reasonable Accommodation?**</u>

Perficient argues that the Count Two failure-to-accommodate claim fails because there was no available job for Moore that would have accommodated her disability. I agree.

The ADA provides that an employer unlawfully discriminates against a qualified individual with a disability when the employer does not make "reasonable accommodations" for the employee, unless "the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(b). An employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999) ("[T]he initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has

discriminated against her."); *see also Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016).

An employer is not required, however, to provide an employee with "the maximum accommodation or every conceivable accommodation possible." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (quoting *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 947 (N.D. Ga. 1997)). Furthermore, although the ADA lists types of possible accommodations, the fact that a particular accommodation may be included does not mean that such accommodation is automatically deemed "reasonable" under the statute. *See Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998). The accommodation must also be reasonable based on the specific facts and circumstances of the case. *Id.*; *Stewart*, 117 F.3d at 1285. "An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259–60 (11th Cir. 2001). "In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." *Holly v. Clairson Indus. L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (internal citation and quotation omitted).

"The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such

accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000); *see also Stewart*, 117 F.3d at 1286. Thus, it is the plaintiff who "bears the burden of identifying a reasonable accommodation that would allow a qualified individual to perform the job, and an employer is not required to accommodate an employee in any manner in which the employee desires." *Gilliard v. Ga. Dep't of Corr.*, 500 F. App'x 860, 868 (11th Cir. 2012) (citing *Stewart*, 117 F.3d at 1285–86).

An employer may need "to initiate an informal, interactive process" with the employee to identify his or her limitations and possible accommodations. 29 C.F.R. § 1630.2(o)(3). But when a plaintiff fails to demonstrate the existence of a reasonable accommodation, "the employer's lack of investigation into reasonable accommodation is unimportant." *Earl*, 207 F.3d at 1367 (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)).

Here, it is undisputed that Perficient tried to accommodate Moore's request to travel less but that there were no available assignments that Moore was willing to accept at the time of her termination.[8] Moore argues that Perficient could have allowed Moore to stay "on the bench" longer, yet she presented no evidence that

---

[8] At oral argument, Moore clarified that she is not raising any claim regarding the Florida Blue project or the travel that she had to do for that assignment. Her lawsuit is focused only on the time after the Florida Blue project ended, when she needed a new assignment and was kept "on the bench" for only a month.

giving Moore more time would have led to an assignment that met her needs and skill set. At her deposition, Moore admitted that she did not know how Perficient could have accommodated her if it had no available vacant projects in the Atlanta area. [Pl. Dep. at 172]. Perficient was under no obligation to create a position for Moore—either on or off the bench. *See Terrell v. USAir*, 132 F.3d 621, 625–26 (11th Cir. 1998) (holding that the defendant was not required to create a part-time position for the plaintiff where all part-time positions had already been eliminated from the company).

Moore appears to argue that Perficient could have left her "on the bench" for longer, rather than terminating her after just a month without any billable work. This argument might have some traction if she could show that non-travel assignments became available within a few days or even months after she was terminated, but there is no such evidence in the record. The only evidence that I could locate on this point is Hoffman's indication that there were no non-travel assignments that met Moore's requirements in the pipeline. [Hoffman Decl. ¶ 46; Doc. 71-9 at 1]. Moore has come forward with no evidence that had she stayed "on the bench" longer than thirty days, a non-travel (or even limited-travel) billable assignment meeting Moore's skill set would have become available. It would be unreasonable for Perficient to keep a billing employee like Moore "on the bench" indefinitely, with no prospects in sight.

43

In the absence of evidence that there was an assignment that would have met her needs and skill set during the relevant time period, I conclude that Moore has failed to show a fact dispute as to the existence of a reasonable accommodation for her condition.[9]   Thus, I will recommend that Perficient's motion for summary judgment on the failure-to-accommodate claim be granted.

### D. COUNT THREE – Retaliation for Requesting an Accommodation

Count Three of Moore's Amended Complaint is titled "Retaliation in Violation of the ADA, as Amended." [Doc. 14 at 18].  In that Count, Moore adopts all the facts offered in support of her other two counts, and  she alleges that Perficient illegally terminated her employment "for requesting an accommodation for her disability."   [Am. Compl. ¶¶ 87–101].  In its motion for summary judgment, Perficient argues that Moore's retaliation claim is indistinct from her discrimination claims and should be dismissed.  [Doc. 71-1 at 23].  *See Gilliard*, 500 F. App'x  at 869 ("We have refused to address a plaintiff's retaliation claims based on an

---

[9] Moore also argues that Perficient should have engaged in a more robust discussion with her about other possible accommodations that might have addressed her anxiety.  Moore argues that because Perficient never discussed alternative accommodations, it failed to engage in the interactive process.  This argument fails because Moore never suggested a reasonable accommodation that existed at the time.  It is the employee's burden to establish that a reasonable accommodation exists before an employer has any duty to engage in an "interactive process" or establish that it could not provide the requested accommodation because of undue hardship.  *See Earl*, 207 F.3d at 1367.

employer's refusal to accommodate her where the described acts relate directly to her reasonable accommodation discrimination claim, not her retaliation claim."). In her brief in opposition to Perficient's motion for summary judgment, Moore does not address this argument. In fact, she does not defend or address her retaliation claim at all; she does not even use the word "retaliation" a single time.[10] [Doc. 75].

"In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Because Moore failed to address Perficient's argument and failed to defend her retaliation claim, the Court may grant summary judgment on it. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001); *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014). But

---

[10] She uses the word "retaliate" only once, in the closing sentence of the brief. [Doc. 75 at 27].

even if the Court is inclined to consider the merits of the Count Three retaliation claim, the result is the same.

The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To prevail on her ADA retaliation claim, Moore must establish each of the following elements of her prima facie case: (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two. *Frazier-White*, 818 F.3d at 1258. "The first element may be met by a request for a reasonable accommodation." *Id.*

As discussed above, there is evidence in the record to create a fact dispute as to whether Moore engaged in statutorily protected expression in April 2018 when she told Hoffman that she needed to travel less after Moore suffered a panic attack. And there is no dispute that Moore suffered an adverse employment action in April 2019 when her employment was terminated. As for the third element—the causal connection—Moore has presented no evidence or argument as to how those two events are causally linked. To the extent that Moore might argue that there is close temporal proximity, such an argument fails because the events occurred more than

a year apart, which is not considered close temporal proximity. *See Frazier-White*, 818 F.3d at 1258. And to the extent Moore might seek to avoid summary judgment on this claim by presenting evidence sufficient to show a convincing mosaic of circumstantial evidence of a retaliatory motive, that argument fails for the same reasons discussed above in connection with her Count One discrimination claim. Simply put, there is no evidence to suggest that anyone intentionally retaliated against Moore because she asked for an accommodation. Accordingly, I will recommend that the motion for summary judgment on Moore's retaliation claim in Count Three be granted.

## III. CONCLUSION

For the reasons stated, I **RECOMMEND** that Perficient's motion for summary judgement [71] be **GRANTED** in full.

[Continued on next page]

I further **RECOMMEND** that Moore's cross-motion for summary judgment [Doc. 62] be **DENIED AS MOOT**.[11]

This 4th day of April, 2022.

CATHERINE M. SALINAS
United States Magistrate Judge

---

[11] Moore has filed a cross-motion for partial summary judgment, seeking a ruling regarding Perficient's defenses on the issues of exhaustion of administrative remedies and mitigation of damages. [Doc. 62]. Because I am recommending that Perficient's motion be granted in full, I need not proceed further into analysis of Perficient's defenses. If the district judge disagrees with my recommendation regarding the merits of Perficient's motion for summary judgment, the case can be returned to me and I will promptly supplement this Report and Recommendation to address the issues presented in Moore's motion.